IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

GLENDA JACQUELINE PRADO,          :

        Plaintiff,

                          Case No. 3:16-cv-320

      v.                          :

                          JUDGE WALTER H. RICE

PAT MAZEIKA, et al.,

        Defendants.          :

---

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING
IN PART DEFENDANTS' MOTION TO STRIKE PORTIONS OF
PLAINTIFF'S AFFIDAVIT (DOC. #70); SUSTAINING IN PART AND
OVERRULING IN PART DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (DOC. #67)

---

Plaintiff, Glenda Jacqueline Prado ("Prado"), has filed suit alleging several

causes of action due to her termination as a probationary caseworker at the

Greene County Department of Job & Family Services where she was employed

for six months. Pursuant to this Court's Decision and Entry, filed September 21,

2018, Doc. #57, the only claims remaining are as alleged in the First, Second and

Third Causes of Action (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

et seq., as amended) and Ninth Cause of Action (Ohio Rev. Code § 4112, et seq.).

Prado alleges in her Amended Complaint that because of her race and ethnicity,

she was subjected to disparate treatment, harassment and retaliation in her

employment by Defendants. Doc. #34, PAGEID#220.[1] This matter is before the
Court pursuant to a Motion for Summary Judgment filed by the sole remaining
Defendants, the Greene County, Ohio, Board of County Commissioners and
Greene County ("Defendants"), Doc. #67. Defendants have moved for summary
judgment on the four remaining causes of action. Prado has filed a response, Doc.
#68, and Defendants have filed a reply, Doc. #69.

A related motion, Defendants' Motion to Strike Portions of Plaintiff's
Affidavit, Doc. #70, is also at issue. Prado has filed a response, Doc. #71, to this
motion and Defendants have filed a reply, Doc. #74.[2] Because Defendants' Motion

---

[1] Prado's Amended Complaint refers to Prado as a "Hispanic immigrant ...from Ecuador"
who has a "Spanish accent." Doc. #34, PAGEID#202. She alleges that "because of her
race and ethnicity[,] she was subjected to disparate treatment, harassment and retaliation
in her employment..." *Id.* PAGEID#220. In the Joint Final Pretrial Order, however, Prado
states that it is her "race and ethnic origin" that is the basis for her three employment
claims. As alleged by Prado throughout her pleadings, however, it is apparent that she
has conflated the terms "race" and "ethnicity" and "race and ethnic origin" and that
Prado's claims are, in fact, based on national origin discrimination. "Title VII prohibits
employment discrimination against individuals because of their national origin group." A
"national origin group" or "ethnic group" shares common language, culture, ancestry,
race, and/or other social characteristics. Hispanics are an ethnic or national origin group.
E.E.O.C. Guidance on National Origin Discrimination, 2016 WL 7116703, *3, November 18,
2016.

[2] Prado has also argued in her response to Defendants' summary judgment motion, Doc.
#68, that Beth Rubin's affidavit ("Rubin Affidavit"), Doc. # 67-1, "be struck, or only those
portions that demonstrate unequivocal personal knowledge be considered." Doc. #68,
PAGEID#921. Prado, however, has failed to identify any specific paragraph of the Rubin
Affidavit that should be stricken and, instead, states only general objections to the
Affidavit, such as lacking personal knowledge of events described therein, hearsay and
unauthenticated documents. It is, however, Prado's "obligation to specifically identify
which statements in the affidavits should be [stricken]." *Wilson v. Budco*, 762 F.Supp.2d
1047, 1058 (E.D.Mich.2011). (citing *AT & T v. Shared Comm'ns Servs.*, No. 93–3492, 1995
WL 555868, at *3 (E.D. Pa. Sept.13, 1995), as cited in *Smith v Interim HealthCare of
Cincinnati, Inc.* 1:10-cv-582, 2011 WL 6012971, at*4 (S.D. OH. Dec.2, 2011). Accordingly,

to Strike, Doc. #70, will affect the record to be considered by the Court in ruling on the Motion for Summary Judgment, Defendants' objections will be decided prior to the summary judgment motion. *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 667 (6th Cir.2005) ("Generally, a district court should dispose of motions that affect the record on summary judgment before ruling on the parties' summary judgment motion.") Accordingly, this Decision and Entry, as it relates to the motion for summary judgment, does not include any information that the Court has determined inadmissible pursuant to Fed. R. Civ. 56(c)(2) and (4).

## I.    Background

On October 6, 2014, Prado was hired as a Caseworker I, probationary employee, for the Children Services Division of the Greene County, Ohio, Department of Job and Family Services. Lana Penney ("Penney"), the Program Resources Manager, was responsible for Prado's interview and recommended that Prado be hired for the position. Doc. #67-1, PAGEID#815; Doc. #66, PAGEID#742.[3] The job description, signed by Prado, set forth "Competency-Based, Essential Functions" of the Caseworker I position and listed the following requirements:

---

the Court will not strike any paragraph of the Rubin Affidavit based on Plaintiff's general objections.

[3] As stated above, information from any objections sustained by the Court pursuant to Defendants' Motion to Strike, Doc. #70, is not included as part of the record for purposes of the motion for summary judgment.

(1)writing strengths-based, family-centered plans for each family into the Statewide Automated Child Welfare Information System (SACWIS); (2) maintain accurate and comprehensive case management documentation and reports within required timeframes ; (3) write, review, compile, and maintain accurate, up-to-date case management records; (4) actively participate in internal agency meetings, including committee meetings, agency work teams, etc.; (5) prepare case testimony and documentation for court hearings; and (6) research and write a thorough Child Study Inventory for each child in the permanent custody of Greene County Children's Services.

Doc. #67-1, PAGEID#815. Additionally, Prado's position also required that she be able to "(1) carry out written and/or oral instructions; (2) work independently and/or exercise independent judgment; (3) prepare meaningful, concise, and accurate reports; (4) manage work timely and consistently; and (5) write effectively." *Id.*, PAGEID##815-816. Prado, like the three other new caseworkers hired at the same time, had the same training schedule which included shadowing opportunities and core training. *Id.*, PAGEID#816. The new caseworkers met daily to review orientation topics and would prepare for assessments of clients. *Id.*

Heather Jamison ("Jamison") was Prado's initial supervisor for her first three months and also evaluated and signed the "mid-probationary" evaluation dated January 6, 2015, along with the Department Director, Beth Rubin ("Rubin"). Doc. #67-2, PAGEID#843. Comments on this initial three-month evaluation indicated that all of Prado's work performance was rated "as expected," although in one category, Customer Service, Prado received a rating of "more than expected" and, in another category, Communication, Prado received a rating of

4

"less than expected." *Id.,* PAGEID##840-844. In general, after three months, Prado was said to "meet overall expectations." *Id.* at PAGEID#842

Prado alleges, however, that during the first three months and throughout the entire six-months of her probationary employment, she was harassed by co-workers and a supervisor, Beth Keller ("Keller"). The harassment from Keller included making fun of Prado's accent on a daily basis, as well as standing on a chair in an adjoining cubicle and looking at Prado, laughing and imitating her accent. Doc. #68-1, PAGEID##930 and 932. Prado also stated that Keller encouraged one of Prado's co-workers to deliberately "pass gas at me" at screening sessions. *Id.* at PAGEID#934. In addition to the actions of Keller, co-workers at meetings would also "trill their R's as Spanish [speaking] people do" to "make fun" of Prado, imitate her walk, stand on chairs and make "grunting and pig noises" when Prado was on the phone with clients, and intentionally give Prado wrong directions to clients' homes. *Id.,* PAGEID##930, 932 and 934. The harassment also included derogatory remarks directed at Prado concerning her clothing, jewelry and on one occasion her office supplies were taken from her desk. Prado testified that she purchased ear plugs in order to lessen the noise and would come in early and leave later. Prado stated that she told her supervisor, Jamison, that this was due to the harassment. Doc. #68-1, PAGEID#934. Prado, crying, complained to her then supervisor, Jamison, concerning the treatment and harassment she was receiving from co-workers. *Id.* at PAGEID#932. This occurred between the end of November and early December 2014. Doc. #66, PAGEIE#634.

5

Jamison, in an unsigned and unauthenticated statement, dated May 27, 2015, stated that Prado was one of four new hires. Jamison "...noted concern that assessment caseworkers did not demonstrate the same willingness to take [Prado] out in the field" as they did with the other new hires, and that during the week of November 17, 2014, Prado approached her due to "concern for the way she was being treated by those that sat near her." Jamison stated that Prado "moved cubicles to sit in the orientation cubicles," which were apparently closer to Jamison, and she continued to work assessment cases with Prado. Doc #67-2, PAGEID##898-99; Doc. 68-1, PAGEID#932. While in Jamison's unit, Prado worked with Jamison to improve Prado's writing skills. Doc. #67-2, PAGEID#898.

Additionally, Prado testified in her deposition that after she complained to Jamison, Jamison then went to Josh Coomer, the Family and Children Services Program Manager/Adoption Supervisor, Doc. #66, PAGEID#634.

> Heather went to -- to Josh Coomer and told him that this was getting bad, and Josh Coomer came with some papers saying about the respect and about the policy of [being] sympathetic toward different ethnic groups and your coworkers and about how to deal with your coworkers and to not -- do not damage them, and a paper saying if you need counseling we will keep it secret that you're being abused and you need some counseling for dealing with others, coworkers.
>
> So it was not like a great thing for me. It was the counseling. Why do I need counseling? I needed somebody to put some order there to let them know that I have -- I needed unfortunately a job.

Doc. #66, PAGEID#630. The paperwork was given to others as well. Doc. #66, PAGEID# 633.

6

In her affidavit, Beth Rubin makes one reference to action taken following

Prado's complaint that was made, per Jamison, during the week of November 17,

2014.

> 19. When the Department became aware of Plaintiff's interactions
> with other employees, Chad King, a Children's Services Manager,
> addressed these issues with the Children's Services Division's
> supervisors, and reminded them that it is important to treat everyone
> with respect. (Ex.F)

> 20. Following the action taken by Mr. King on behalf of the
> department, Plaintiff did not speak to any member of management
> about the treatment she alleges to have been experiencing, and
> management believed that the situation had been resolved.

Doc. 67-1, PAGEID##817-18.

Rubin's Affidavit refers to an "Exhibit F" which indicates that on January

15, 2015, Chad King, a Children Services Manager, addressed Prado's interactions

with the other employees with the supervisors of the Children's Services Division

and "reminded them that it is important to treat everyone with respect." Doc. 67-

1, PAGEID#817. Prado testified that she never spoke to either Josh Coomer or

Chad King about any further issues she experienced. According to Rubin's

Affidavit, "management believed that the situation had been resolved." Doc. #66,

PAGEID#634; Doc. #67-1, PAGEID#818.

Following the initial three-month evaluation, Prado was moved, during the

week of January 19, 2015, to fill a vacancy in the Outgoing department. Prado's

supervisor in Outgoing was Pat Mazeika ("Mazeika"). Jamison, however,

continued to work with Prado on SACWIS entry as part of her evaluation goals,

and met weekly with Prado to review tools to aid in entry of SACWIS required documents. Doc.#67-2, PAGEID##898-99. Mazeika likewise stated in an affidavit that she "provided extensive training and additional help" to Prado in preparing reports and that the amount of time spent with her "often prevented me from addressing the needs of other new caseworkers." Doc. #67-1, PAGEID#903.

On March 10, 2015, Prado received a "Final Probationary" review from Lana Penney, Mazeika and Amy Amburn. Doc. 67-1, PAGEID#818. At this final evaluation, Prado was rated "less than expected" in all categories with the exception of "control," and "use of equipment" where she was rated "as expected." Doc. #67-2, PAGEID#879-882. Prado, although given the opportunity to resign, refused to do so and was terminated on March 10, 2015. Following Prado's termination, she filed a charge of discrimination with the EEOC on May 11, 2015. Doc. #67-2, PAGEID#863. Prado was issued a right to sue letter on May 23, 2016. Doc. #34, PAGEID#215.


## II.    Legal Analysis

### A. Motion to Strike

#### 1. Introduction

Defendants have moved to strike certain paragraphs in Prado's affidavit, Doc. #68-1 ("Prado Affidavit"), arguing lack of personal knowledge, inadmissible hearsay and that certain paragraphs contradict Prado's earlier deposition testimony, Doc. #66. Doc. #70. In resolving the motion, the Court must use "a

scalpel, not a butcher knife," striking only those "portions of affidavits that do not satisfy the requirements of Rule 56(c)." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 593 (6th Cir.2009) (quoting *Giles v. Univ. of Toledo*, 241 F.R.D. 466, 469 (N.D. Ohio 2007)).  When addressing alleged deficiencies in affidavits filed in connection with summary judgment motions, however, an objection is the proper vehicle and "[T]here is no need to make a separate motion to strike." Fed. R. Civ. P. 56 (2010 Advisory Committee comments); *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10–cv–1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011). "The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent, Prado, to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike." Fed. R. Civ. P. 56 (2010 Advisory Committee comments)." The Court will rule on Defendants' motion to strike construing this pleading as objections contained therein. *Reed v. Austal, U.S.A., L.L.C.,* No. 08–00155-KD-N, 2011 WL 4435562, at *5 n. 6 (S.D.Ala. Sept.23, 2011).

### 2. Lack of Personal Knowledge, Inadmissible Hearsay and Prior Deposition Testimony

Rule 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion" for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). As

such, an affidavit must lay a foundation as to why the affiant is competent to testify to the matters stated therein. *Loadman Group, L.L.C. v. Banco Popular North America*, No. 4:10 cv 1759LIO, 2013 WL 1154528, *3 (N.D. Ohio March 19, 2013) citing *Lewis v. Horace Mann Ins. Co.*, 410 F.Supp.2d 640, 647 (N.D. Ohio 2005). Without a proper foundation, the affidavit may be disregarded. *Id.*

Hearsay in an affidavit, absent an exception, cannot be considered on a motion for summary judgment. *Bluegrass Dutch Trust Morehead, LLC v. Rowan County Fiscal Court*, 734 Fed. Appx 322, 327 (6th Cir. 2018), citing *Daily Press, Inc. v United Press Int'l*, 412 F.2d 126, 133 (6th Cir. 1969); see also *Wiley v. United States*, 20 F.3d 222 (6th Cir. 1994). If hearsay exists in affidavits utilized in summary judgment motions, the proponent, in this case Prado, has the burden of finding the exception that permits the hearsay to come into evidence. *United States v. Arnold,* 486 F.3d 177, 206 (6th Cir.2007) (quoting *United States v. Kendrick*, 853 F.2d 492, 496 n. 3 (6th Cir.1988)).

Finally, with respect to affidavits that contradict earlier deposition testimony, unless a "persuasive justification for the contradiction" exists, the affidavit, if it directly contradicts sworn deposition testimony, should be disregarded. See, *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) (post-deposition affidavit must directly contradict the nonmoving party's sworn deposition in order to be stricken unless the district court determines that the affidavit is an attempt to create a sham issue).

Defendants have moved to strike 23 different paragraphs contained in the Prado Affidavit, Doc. #68-1. Some of Defendants' objections are based only on Prado's alleged lack of personal knowledge and other objections are predicated both on Prado's alleged lack of personal knowledge <u>and</u> specific statements that constitute inadmissible hearsay. Finally, Defendants object to three paragraphs from the Prado Affidavit, contending that these paragraphs contradict her prior deposition testimony.

The Court has reviewed Prado's response to Defendants' motion to strike, Doc. #71. Prado responds generally to the objections and argues that she has personal knowledge of all matters stated in her affidavit and that the allegedly objectionable paragraphs are not hearsay or, if hearsay, the statements are from witnesses who "can be brought to the trial of this matter..." Doc. #71, PAGEID#989. Prado also denies that there is any contradiction between her affidavit and earlier deposition testimony. [4] Because Prado has had sufficient

---

[4] In her response to the motion to strike, Prado also cites the Court to twenty-two citations from her deposition Doc. #66, which she referenced in her response to Defendants' summary judgment motion, Doc. #68. *Id.* at PAGEID##990-991. Prado contends that Defendants' objections should be disregarded. "Plaintiff would point out that nearly all statements that Defendants now move to strike are also referenced in the Response to Defendants' Motion for Summary Judgment from the deposition [of Prado] in this matter [,] which Defendants filed [,] and in which no objections were raised [by Defendants] to any of these statements." Doc. #71, PAGEID##989-90. It is unclear to the Court what Prado is arguing and what relevance it has to Defendants' objections, since no legal authority is cited and no further explanation by Prado is given.

opportunity to respond to Defendants' objections, the issue is ripe and the Court will rule only on the specific objections raised by Defendants.

### 3. Objections based on lack of personal knowledge or lack of personal knowledge and inadmissible hearsay (Paragraphs 2, 4, 7, 11, 13, 14, 22, 23, 27, 28, 31, 32, 33, 36, 41, 42, 43, 44, 45, 47, 51, 55, and 56)

Defendants have objected to 23 paragraphs of Prado's Affidavit, Doc. # 68-1, based on either lack of personal knowledge or both lack of personal knowledge and hearsay. The Court will address the objections individually.

a. Paragraph 2 ("I was informed by Tammi Holloway that I had been offered the job of Caseworker at Greene County Children's Services and began work on October 6, 2014") is objected to by Defendants based on Prado's lack of personal knowledge. This objection is overruled since Prado is basing this statement in her Affidavit on her own personal knowledge and experience.

b. Paragraph 4 ("On my second day, I was required to attend a screening meeting with Beth Keller and other employees. Keller was a supervisor who did daily screenings of reports and assignments of cases. At this session, Keller began making gestures to the others, staring, making comments about my clothing and jewelry, saying that they were "shiny" and making fun of my accent") is objected to by Defendants based on Prado's lack of personal knowledge and hearsay. These objections are overruled, since Prado personally observed the events described.

12

Additionally, Beth Keller's alleged statements concerning Prado's "shiny" clothing and jewelry, and making fun of her accent, are not hearsay, since they are not offered to prove the truth of the matter asserted.

c. Paragraph 7 ("Supervisor Keller also began a pattern of assigning cases to everyone else but me") is objected to by Defendants based on lack of personal knowledge. This objection is overruled since it is undisputed that Keller assigned cases on a daily basis to the caseworkers at 11:00 a.m. meetings and that Prado was present for these meetings.

d. Paragraph 11 ("I was explicitly told by another employee, Maria Sostrom, that nobody wanted to take me because of my accent") is objected to by Defendants due to lack of personal knowledge and hearsay. The objections are sustained as to lack of personal knowledge and hearsay since it is being offered by Prado for the truth of the matter asserted.

e. Paragraph 13 ("Supervisor Keller's response stated in my presence at a screening meeting was to see if she had any "shitty" cases for me") is objected to due to lack of personal knowledge and hearsay. The objection for lack of personal knowledge is overruled and the objection based on hearsay is also overruled pursuant to Fed. R. Evid. 801(d)(2)(D).

f. Paragraph 14 ("Caseworker Ann Masters said she would give me three little Blacks so I could play Santa Theresa") is objected to by Defendants

due to lack of personal knowledge and hearsay. These objections are overruled since Prado was present for the statement, and because the statement is not being offered to prove the truth of the matter asserted, it is not hearsay.

g. Paragraph 22 ("I had been told by two other employees while working at Greene County Children's Services never to cross Beth Keller because her husband Major Kirk Keller "held the Keys to the jail and everyone was afraid of her, and they were setting me up to react") is objected to by Defendants due to lack of personal knowledge and hearsay. The objection for lack of personal knowledge is overruled and sustained as to hearsay.

h. Paragraph 23 ("Around Christmas, Supervisor Keller had an incident with an African-American mother whose children had received no presents from the agency. I was told by Caseworker Kristi Weber that Keller had already called the police. Supervisor Josh Coomer asked me if I could give this woman a ride and to calm the woman down. I did this and the woman thanked me. The police were not needed, the mother was just under stress") is objected to by Defendants due to hearsay and lack of personal knowledge. The Court will sustain the objection for lack of personal knowledge as to the first sentence and hearsay as to the second sentence. Defendants' objections for hearsay and lack of personal knowledge concerning the statement "Supervisor Josh

Coomer asked me if I could give this woman a ride and to calm the woman down." will be overruled since Prado was present and Supervisor Josh Coomer's statement is admissible pursuant to Fed. R. Evid. 801(d)(2)(D). Defendants' objections for the remainder of Paragraph 23 and the statements, "I did this. The police were not needed, the mother was just under stress." will be overruled.

i. Paragraph 27 ("Alexis did speak to Heather [Jamison]and told me right after speaking to Heather") is objected to by Defendants due to lack of personal knowledge. The Court will sustain this objection since there is no foundation to indicate that Prado was present when any conversation occurred between Alexis and Heather or what was said.

j. Paragraph 28 ("Heather spoke to her supervisor Josh Coomer about this") is objected to by Defendants due to lack of personal knowledge. The Court will sustain this objection since there is no foundation to indicate that Prado had any knowledge as to whether this conversation between Jamison and Josh Coomer occurred, or what subject was discussed.

k. Paragraph 31 ("Because the harassment did not stop, in early January, 2014, Alexis went to Coomer's supervisor Amy Auburn and Auburn reacted by getting angry [.] Alexis told me about this conversation") is objected to by Defendants due to lack of personal knowledge. This objection will be sustained since there is no foundation laid in this

affidavit to indicate that Prado had any personal knowledge of the incidents described.

l.  Paragraph 32 ("Sometime in January, 2015, Alexis told me she was in trouble for breaking into a client's house to rescue cats. Supervisors, including Amy Amburn, were determining how to cover this up[.] Alexis was not terminated") is objected to by Defendants due to lack of personal knowledge. This objection is overruled since Prado was present when Alexis told her about this.

m.  Paragraph 33 ("At the EEOC mediation, Beth Rubin admitted she knew about the harassment") is objected to by Defendants for lack of personal knowledge. This objection will be sustained. Although Prado was present at the EEOC mediation, there is no foundation laid by Prado to indicate that when Prado was present she heard Beth Rubin make this statement.

n.  Paragraph 36 ("I was also sent to a rural address to a trailer park outside of Wilmington on a very snowy road and had to be dragged from a ditch. The address did not exist. I was later told by Ann Masters as she was laughing at me that the person was not there but in the town") is objected to by Defendants due to lack of personal knowledge and hearsay. The Court will overrule the objections as to the first and second sentence and sustain Defendants' hearsay objection to the last sentence of Paragraph 36.

o. Paragraph 41 ("As part of our jobs we were required to write reports, Supervisor Mazeika re-wrote these reports, not just mine, in order to make them conform to her own preconceptions about a case. Mazeika would also get me to have the client sign a third undated document in addition to the others so she could use it to cover herself and the agency") is objected to by Defendants due to lack of personal knowledge.  Defendants' objection will be sustained as to everything in Paragraph 41 with the exception of the statement "As part of our jobs we were required to write reports..." and the statement "Mazeika would also get me to have the client sign a third undated document in addition to the others..." since these statements are based on her personal knowledge

p. Paragraph 42 ("I several times requested meetings with Supervisor Mazeika to ask questions. There were several requests because Mazeika would schedule time for me but would then give my time to other white employees. I got frustrated by her avoidance and wrote her an e-mail which is Exh. 9 in my response") is objected to due to lack of personal knowledge. Defendants' objection is overruled with respect to the first sentence, since Prado had personal knowledge of making a request to her then supervisor, Mazeika. The objection to the second sentence is sustained, since there is no foundation laid indicating that Prado had personal knowledge that Mazeika gave Prado's time to other white

employees. As to the final sentence, the Court sustains the objection based on lack of personal knowledge, since there is no foundation laid by Prado that Mazeika was avoiding Prado. With respect to Prado's reference to Exhibit 9, Doc. # 68-1, PAGEID#958, the Court overrules Defendants' objection to this exhibit, since, although it is unauthenticated, Prado would be able to present the email in a form that would be admissible in evidence for trial.

q. Paragraph 43 ("At some time in January, 2015 after joining Mazeika, I told Heather that the reports I saw were not accurate, and was told it was better to keep quiet because this had been happening for a long time") is objected to by Defendants based on lack of personal knowledge and hearsay. The Court overrules the objection to "I told Heather that the reports I saw were not accurate," since Prado made the statement, has personal knowledge and is subject to cross-examination at trial. As to the portion which reads "...and was told it was better to keep quiet because this had been happening for a long time," this will also be overruled. Prado was present and it is not hearsay pursuant to Fed. R. Evid. 801(d)(2)(D).

r. Paragraph 44 ("I went to a training in Piqua with Xan Boone on January 30, 2015 and told him and the class about my treatment because of my ethnicity and was advised to go to the EEOC") is objected to by Defendants due to lack of personal knowledge and hearsay. The

objections for personal knowledge and hearsay are overruled for the portion which reads "I went to a training [session] in Piqua with Xan Boone on January 30, 2015 and told him and the class about my treatment because of my ethnicity..." since Prado allegedly made the statement, has personal knowledge of it and is subject to cross-examination at trial. The objections based on personal knowledge and hearsay are also overruled for the remainder of Paragraph 44 which reads "and was advised to go to the EEOC" since Prado was present and the statement is not being offered for the proof of the statements and is not hearsay.

s. Paragraph 45 ("Heather Jamison spoke to me and told me that the supervisors had had a training [session] with Xan Boone a week after mine and Boone had told Chad King of my concerns and King had asked her to see if the harassment was continuing and I told her it was. This was in mid-to late February, 2015") is objected to by Defendants' due to lack of personal knowledge and hearsay. The portion which reads "Heather Jamison spoke to me and told me that the supervisors had had a training [session] with Xan Boone a week after mine" is not hearsay pursuant to Fed. R. Evid. 801(d)(2)(D). Additionally, Prado was present for this statement and has personal knowledge. As to the portion which reads "and Boone had told Chad King of my concerns" will be sustained as hearsay since, although Chad King is a supervisor and the statement

could be admissible pursuant to Fed. R. Evid. 801 (d)(2)(D), it is unclear if Xan Boone is an agent or employee of Defendants. The portion which reads "and King had asked her [Jamison] to see if the harassment was continuing" is admissible, since both King and Jamison are supervisors of Defendants and the statement would be admissible pursuant to Fed. R. Evid. 801 (d)(2)(D). The final portion of this paragraph, "and I told her it was. This was in mid-to late February, 2015," is admissible since Prado made the statement, has personal knowledge and is subject to cross-examination at trial.

t. Paragraph 47 ("The previous caseworker, Kate Mezera[,] was hostile towards me, wouldn't talk to me and threw the file at me. I reported this to Mazeika who said just to follow Mezera's report and that disabled children involved too much work") is objected to by Defendants for lack of personal knowledge and hearsay. The Court overrules the lack of personal knowledge objection since Prado was present. The hearsay objection is overruled pursuant to Fed. R. Evid. 801(d)(2)(D).

u. Paragraph 51 ("I reported my findings to Mazeika who told me that Mezera was a "star' at the agency and that we couldn't criticize her") is objected to by Defendants for lack of personal knowledge and hearsay. The Court overrules the objections based on lack of personal knowledge and hearsay since Prado was present and the statement from Mazeika is admissible pursuant to Fed. R. Evid. 801(d)(2)(D).

v. Paragraph 55 ("I was complimented by among others Amy Amburn[ ] on this case") is objected to by Defendants for lack of personal knowledge and hearsay. The Court overrules the objection based on lack of personal knowledge since Prado was present. The hearsay objection is also overruled since it is admissible pursuant to Fed. R. Evid. 801(d)(2)(D) because Amy Amburn is the Senior Manager. (Doc. #67-2, PAGEID#873)

w. Paragraph 56 ("At a training session on February 17-19, 2015, I shared the mishandling of this case with the trainer and the other students and was advised to bring it to staff's attention") is objected to by Defendants based on lack of personal knowledge and hearsay. The Court overrules the objection as to personal knowledge and hearsay since Prado made the statement and the statement is not being offered for the truth of the matter.

### 4. Contradictions in Deposition Testimony (Paragraphs 2, 7 and 33)

Defendants final set of objections relate to Paragraphs 2, 7 and 33 of the Prado Affidavit. They contend that these three paragraphs directly contradict Prado's prior deposition testimony. The Court has reviewed Prado's deposition testimony, Doc. #66, as well as the Affidavit, and overrules the objections since it does not find any "direct contradiction."

Defendants incorrectly state that Paragraph 2 contradicts Prado's deposition. "With respect to paragraph 2, Plaintiff claims that "Tammi Holloway" offered her the Caseworker position. However, during her deposition, Plaintiff testified that Lana Penney hired her. (Doc. #66, PageID 650)." Doc. #70, PAGEID#986. However, Paragraph 2 of Prado's Affidavit simply says that Prado "was informed by Tammi Holloway that I had been offered the job of Caseworker..." The Court does not find a "direct contradiction." Nor does the Court believe that any sort of "sham issue" has been created by Prado. *Aerel, S.R.L.* 448 F.3d at 908 (6th Cir. 2006) (post-deposition affidavit must directly contradict the nonmoving party's sworn deposition in order to be stricken, unless the district court determines that the affidavit is an attempt to create a sham issue). Prado has testified in her deposition that Lana Penney "hired her," Doc. #66, PAGEID#650, which is not the same as being "informed" of being offered the Caseworker position. Accordingly, Defendants' objection is overruled.

Defendants next argue that Paragraph 7 ("Supervisor Keller also began a pattern of assigning cases to everyone else but me"), is a contradiction of Prado's deposition testimony, "because she testified that Beth Keller assigned cases to everyone." Doc. #70, PAGEID#987. Defendants again cite the Court to Prado's deposition testimony, Doc. #66, PAGEID#605. This testimony, however, does not support Defendants' argument of a direct contradiction. Prado testified that she stayed in the back, was not welcome and, based on a review of her entire

testimony, it appears that, in fact, everyone else was receiving cases. Doc. #66, PAGEID#606. Accordingly, this objection is overruled.

Defendants' final objection concerns whether Paragraph 33, ("At the EEOC mediation[,] Beth Rubin admitted she knew about the harassment,") is contradicted by deposition testimony. Specifically, Defendants state that Prado "previously testified during her deposition that she never spoke to Beth Rubin during the EEOC mediation. (Doc. #66, PageID 634)." Doc. #70, PAGEID#987. However, although Prado testified at her deposition that she did not talk personally to Rubin at the EEOC, she also stated that "Beth Rubin has never [been] seen in the agency but when I went to it, the EEOC, I saw her and she say there were people actually taking care of the treatment they give to me. She say it was evidently a lot of the discrimination and they were treating me really bad in the agency." Doc. #66, PAGEID#633-34. This testimony suggests that Prado did talk or at least hear Beth Rubin discuss Prado's discrimination at the EEOC mediation. Because of this, the Court does not find any direct contradiction with Paragraph 33 of the Prado Affidavit and her earlier deposition testimony. As such, Defendants' objection is overruled.

**B. Motion for Summary Judgment**

   **1. Standard**

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a

24

jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998). In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). If it so chooses, however, the Court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

**2. Title VII Disparate Treatment, Hostile Work Environment Through Harassment and O.R.C. §§ 4112.02(A) and 4112.99 Claims (Counts I, II and IX)**

Prado's First and Second Causes of Action are both alleged to be Title VII violations, "Disparate Treatment" and a Hostile Work Environment Through Harassment, respectively, with the Ninth Cause of Action being a state law claim under the analogous Ohio Fair Employment Practices Act, §§ 4112.02(A) and 4112.99 of the Ohio Revised Code. Doc #34, PAGEID## 202, 215 and 222. It is well-established that a § 4112 state law claim utilizes the same analytical framework as Title VII discrimination claims.

> The Ohio courts have held that the evidentiary standards and burdens of proof applicable to a claimed violation of Title VII … are likewise applicable in determining whether a violation of Ohio Rev. Code § 4112 has occurred. Thus, the federal case law governing Title VII actions is generally applicable to cases involving alleged violations of § 4112. *Williams v. Ford Motor Co.* 187 F.3d 533, 538 (6th Cir.1999) (citations omitted), as cited in *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th 2004); See, also, *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192, 196 (1981), indicating "reliable, probative, and substantial evidence" in an employment discrimination case brought pursuant to R.C. Chapter 4112 means evidence sufficient to support a finding of discrimination under Title VII.

Because Ohio courts analyze § 4112 claims utilizing Title VII case law, the Court will consider Prado's alleged state law employment violations along with the Title VII claims.

Title VII prohibits employment practices that are "fair in form but discriminatory in operation" *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, (1971), and specifically makes it "an unlawful employment practice for an employer … to

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... national origin." 42 U.S.C. § 2000e–2(a)(1)." While a particular decision that an employer makes, such as termination, if based on national origin, is an "unlawful employment practice," E.E.O.C. Guidance 2016 WL 7116703 *3, another "form of proscribed discrimination" under Title VII is "[T]he creation of a hostile work environment through harassment..." *Vance v. Ball State University,* 570 U.S. 421, 452 (2013)(employer vicariously liable for employees unlawful harassment only when the employer has empowered that employee to take tangible employment action) (Ginsburg, J., dissenting). "In line with those decisions, in 1999, the Equal Employment Opportunity Commission (EEOC) provided enforcement guidance 'regarding employer liability for harassment by supervisors based on sex, race, color, religion, national origin, age, disability, or protected activity.'" *Id.* citing EEOC, Guidance on Vicarious Employer Liability For Unlawful Harassment by Supervisors, 8 BNA FEP Manual 405:7651 (Feb. 2003).

Although the legal analysis for Prado's alleged Title VII violations, disparate treatment and hostile work environment through harassment, is similar, it is not identical. As such, the Court will review each claim separately.

### 3. First Cause of Action - Disparate Treatment

In order for Prado to prove that she was terminated by Defendants due to her national origin in violation of Title VII and Ohio law, Prado must produce

27

either direct evidence or circumstantial evidence of discrimination. *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496 (6th Cir. 2007) (employee, an Iraqi citizen, must proffer either direct or circumstantial evidence of discrimination for discharge based on national origin in violation of both Title VII, 42 U.S.C. § 2000e et seq. and O.R.C. § 4112.01); *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir.2004); *Holbrook v. LexisNexis*, 169 Ohio App.3d 345, 862 N.E.2d 892, 896 (Ohio Ct. App. 2006). Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Idemudia v. J.P. Morgan,* 434 Fed. Appx. 495, 500 (6th Cir. 201) (Nigerian born African American failed to establish direct evidence of discrimination based on national origin and race based on manager's statement that he once dated an African American woman but that she broke up with him because he is white). Prado does not argue the existence of any direct evidence of discrimination and, instead, is relying on circumstantial evidence and the doctrine of disparate treatment along with the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as subsequently modified by *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981). If a *prima facie* case is found to exist based upon the evidence in the case, a rebuttable presumption of unlawful discrimination exists. The burden of establishing a *prima facie* case of disparate treatment is typically not onerous. *Burdine*, 450 U.S. at 253.

To establish a *prima facie* case of discrimination, in this case based on national origin,[5] Prado must show that (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. *Rodriguez-Monguio v. Ohio State University*, 499 Fed. Appx. 455 (6th Cir. 2012) (insufficient circumstantial evidence presented to establish a *prima facie* case of national-origin discrimination for non-renewal of professor's one-year contract); *Sharma v. Ohio State University*, 25 Appx. 243 (6th Cir. 2001) (*prima facie* case of employment discrimination based on national origin under Title VII not established by professor since no evidence that he was treated less favorably than other similarly-situated professors outside of protected class).

Once a *prima facie* case has been established, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. A defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions. *Burdine*, 450 U.S. at 260. If the employer is able to do so, the burden shifts back to the employee, who must show that the employer's nondiscriminatory reason is

---

[5]Because Title VII prohibits employment discrimination against individuals because of their national origin group, "[I]t is enough to show that the victim was discriminated against 'because of his or her foreign accent, appearance or physical characteristics.'" 45 Fed. Reg. 85,632, 85,633 (Dec. 29,1980) (EEOC's preamble to "Guidelines on Discrimination Because of National Origin"), as cited in E.E.O.C. Guidance, 2016 WL 7116703, *3, November 18, 2016.

actually pretextual. *McDonnell Douglas*, 411 U.S at 804. This requires the employee to show that the reason given by the employer has no factual basis, did not actually motivate the adverse employment action, or would have been insufficient to motivate such an action. *Id*.

Defendants argue, however, that Prado cannot even establish a *prima facie* case of discrimination.  Although Defendants concede that she was a member of a protected class due to national origin, Doc. #67, PAGEID#799, and suffered an obvious adverse employment action when terminated at the end of her six-month probationary period, they argue that Prado was not qualified for the position, due to her poor writing skills and inability to document properly, and that there is no evidence that she was replaced by "someone outside the protected class or was treated differently than similarly-situated, non-protected employees."

In support of the argument that Prado was "not qualified," Defendants point to Prado's three-month evaluation as evidence of her lack of qualifications. The initial evaluation, signed by Prado and her then-supervisor Jamison, along with Rubin as the Director, states that in the category of "Communication: Listens to/reads and understands information. Relays accurate, appropriate and clear information in written and/or oral form." Prado was deficient in that she "[C]onsistently contributes" "Less than expected." Doc. #67-2, PAGEID#841. The Comments section associated with this category details why Prado received this evaluation in the Communication category.

Glenda has been working with the supervisor to improve her writing skills for assessments and documentation. Glenda is adapting to the writing requirements and expectations of the agency, noting her previous documentation requirements were more geared towards documenting exact scripting of the conversation held. Glenda has been receptive to feedback and has been willing to participate in additional webinar focused on developing strong documentation techniques for child protection services. Glenda expresses a desire to improve her writing skills and to be able to provide documentation that does not require rework.

As a result of this evaluation, Defendants gave Prado an "action plan" which

required her to

> develop a resource book specific to working in SACWIS. The supervisor and Glenda will review SACWIS tutorials and articles through the Knowledge Base and other resources. Glenda will add at least one tutorial/article per week taking the time to review each resource. Glenda will be able to demonstrate increase SACWIS skill by being self-directed.

*Id.* at PAGEID#843.

Prado's "goal," per her evaluation, was to "be able to provide thorough, well-written assessments and documentation that do not require rework." *Id.* The "measurement" agreed to by Prado at this initial evaluation was that she would complete a documentation webinar, would gather "additional resources related to CAPMIS" and that she and her supervisor will have shown improvement "by a decrease in the amount of corrections and reworks suggested by the supervisor during reviews." *Id.* In Prado's final detailed probationary evaluation on March 10, 2015, prepared by Mazeika, her supervisor since mid-January 2015, she was given a "less than expected" in nearly every category. Doc. #67-2, PAGEID#879-886.

In addition to the evidence before the Court from Prado's three-month and six-month evaluations, both the Rubin Affidavit and the affidavit of Mazeika ("Mazeika Affidavit") elaborate on Prado's difficulties in communication and writing following her transfer to the Ongoing Unit in January 2015. According to the Mazeika Affidavit, Mazeika became Prado's supervisor after her transfer in January 2015. Both she and Jamison, Prado's first supervisor, provided writing assistance to her. Jamison did so on a weekly basis. Mazeika states in her affidavit that she "provided extensive training and additional help to Plaintiff. However, the reports Plaintiff submitted often had to be returned to her for corrections multiple times," and that "the amount of direction Plaintiff required often prevented me from addressing the needs of other new caseworkers." Doc. #67-3, PAGEID#903. Mazeika, as she stated in her affidavit, spent hours with Plaintiff working on the documentation and reports needed following the removal of a child from the home of a grandparent, Doc. #67-3, PAGEID#904, and despite repeated requests, Prado, according to Rubin, refused to use spelling and grammar checks on the computer prior to submitting her reports. Doc. #67-1, PAGEID#816. According to Rubin, Prado's inability to use these tools required supervisors to either correct the report themselves, or go through the reports line by line with Prado. *Id.* Defendants also contend that Prado repeatedly refused to comply with the department's formatting guidelines for letters to clients and businesses, and would continuously argue with her superiors when they attempted to give her feedback on her work. *Id.*

In addition to the deficiencies in communication, the Maizeka Affidavit details problems observed by Plaintiff's last supervisor in Prado's interacting with clients and preparation of case testimony and documents for court hearings. Based on the evidence from the evaluations and the Rubin and Mazeika Affidavits, Defendants contend that Prado has not established a *prima facie* case of discrimination under the *McDonnell Douglas/Burdine* test, given that, at the end of her six-month probationary period, she was "not qualified."

While Prado accepts the *McDonnell Douglas/Burdine* test, her Response does not address Defendants' assertion that she was not qualified for a permanent position as a Caseworker due to her allegedly poor writing skills and documentation of charts, as well as allegedly poor performance with clients and in the preparation of case testimony and documents for court hearings. Instead, Prado asserts, despite her three-month evaluation, action plan and agreed upon goals, that she was "transferred to the Ongoing Department on January 16, 2015, with a positive three-month review and no complaints on her job performance and a willingness to work with others and accept suggestions (Exh. 3 Jamison Statement, Exh.4, Three Month Review)." Doc.#68, PAGEID#920. Prado claims that "[T]here exist no documented disciplinary actions or complaints of any sort concerning Plaintiff or her job performance, nor any complaints against her at the weekly unit meetings, at any time until the firing document on March 10, 2015." *Id*. Prado also responds to the argument that she had poor writing skills and trouble with documentation by arguing that she was a victim of "constructive

33

discharge," denied training opportunities, not assigned cases, had her work interrupted by others, subjected to ridicule for her clothing and accent, '"had gas repeatedly and intentionally passed at her, and was intentionally splashed with water in the restroom." Doc. #68, PAGEID## 917 and 918." Prado does not respond substantively to Rubin's Affidavit and instead asserts that the entire affidavit should be stricken "or only those portions that demonstrate unequivocal personal knowledge be considered.[6] Prado makes little mention of the Mazeika Affidavit other than to argue that this witness has given an "unsworn, undated and unsigned statement." The Court notes, however, that the Mazeika Affidavit is, in fact, sworn, dated and signed. Doc. #67-3, PAGEID#904.

In addition to arguing that Prado was "not qualified" for the Caseworker I position, Defendants also contend that Prado fails to meet the fourth element of the *McDonnell Douglas/Burdine* rebuttable presumption test, since she has failed to establish that she was treated differently than similarly-situated, non-protected probationary employees.[7] Defendants argue that Prado was hired along with three other new caseworkers for the Caseworker I position, and although the

---

[6] In addition to being one of the signatories on Prado's three-month review, Rubin, as the Director, had personal knowledge of Prado's performance given her job title and responsibilities. As stated previously in this Decision and Entry, it is incumbent upon the objecting party to identify the specific paragraphs that should be stricken pursuant to Fed. R. Civ. P. 56(c)(2).

[7] Prado cannot use non-probationary employees to argue that they were similarly situated to her. *Cooper v North Olmstead*, 795 F. 2d 1265 (6th Cir.1986) (Probationary employees do not stand on equal footing with permanent employees and cannot be considered to be similarly situated).

evidence before the Court suggests that these other three newly hired caseworkers were "outside the protected class," Prado has offered no further information in support of her argument that she was "similarly situated" to them. Specifically, Prado has presented no evidence that any of the other three probationary employees, or any prior probationary employee, who showed the same lack of qualifications for the Caseworker I position, was not removed following the probationary period.

In *Petzel v. Redflex Traffic Sys., Inc.*, 644 F. App'x 434, 440 (6th Cir. 2016), the Sixth Circuit affirmed summary judgment for the employer on a Title VII gender discrimination case, involving a female sales associate who was terminated for not meeting a sales goal that required the execution of at least two contracts in the prior six months. In *Petzel*, the terminated female sales associate was replaced by a male sales associate who also had not satisfied the same contract execution goal. The Court found, however, that they were not "similarly situated," since the male replacement had a significantly better sales history and had also assumed additional responsibility for development and implementation of a new product.

> In order to be similarly situated, employees must be similar in 'all relevant respects.' *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998). The plaintiff need not demonstrate an exact correlation with the employee who received more favorable treatment. However, courts 'should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee.' *Id.* To be deemed similarly situated, the individual with whom the plaintiff seeks to compare her treatment must have been

subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Hollins v. Atl. Co.*, 188 F.3d 652, 659 (6th Cir.1999) (internal citation omitted).

In this case, Prado fails to establish that any of the other three probationary employees were similarly situated to her. Specifically, there is no evidence before the Court that any of the other three probationary employees had the same supervisors, the same workload, were unable to "provide thorough, well-written assessments and documentation that do not require rework," had problems interacting with clients, or were unable to prepare case testimony and documents for court hearings, yet were still hired by Defendants at the end of their probationary periods.  Although, as stated earlier, the burden of establishing a *prima facie* case is "typically not onerous" *Burdine*, 450 U.S. at 253, there must be some evidence by which the Court can establish or at least infer disparate treatment. Having reviewed the evidence, the Court concludes that Prado has not established a *prima facie* case of discrimination.

Given that Prado has failed to establish a *prima facie* case of discrimination, Defendants are not required to offer a "legitimate nondiscriminatory reason" for her termination, *Wright v. Murray Guard, Inc.* 455 F. 3d 702 (6th Cir. 2006) (citing *Burdine*, 450 U.S. at 253).  Defendants, however, submit that even assuming a *prima facie* case of discrimination has been established, their documented three-month and six-month evaluations create a "legitimate nondiscriminatory reason" for Prado's termination, *Burdine*, 450 U.S. at 255, and, given that Prado has

36

offered no evidence that this is pretextual, a judgment in their favor is warranted. Doc. #67, PAGEID##804-806. This Court agrees. Without the need for extensive analysis, Prado, who bears the ultimate burden of proving the intent to discriminate by a preponderance of the evidence, has failed to demonstrate a genuine issue of material fact on this issue. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511(1993). Because there is no dispute of a material fact as to the third element of the *prima facie* test, that Prado was not qualified for the position, or the fourth element, that Defendants treated her differently than any similarly situated terminated probationary employee, Defendants are entitled to summary judgment in their favor on Prado's First Cause of Action, as well as on any claim that might exist for discrimination pursuant to Ohio's analogous Fair Employment Practices Act, §§ 4112.02(A) and 4112.99 of the Ohio Revised Code.

### 2. Second Cause of Action under Title VII – Harassment, Construed as a Title VII Claim for Hostile Work Environment Through Harassment

Prado has alleged in her Second Cause of Action "harassment" which, as alleged and argued, is a Title VII claim for a "hostile work environment." Prado alleges that the harassment was from co-workers as well as from Keller, a supervisor.[8]

The evidence before this Court, which has not been directly challenged by Defendants, is that, from almost the very beginning of Prado's employment and

---

[8] Keller, although a supervisor, was not Prado's direct supervisor.

almost daily, Keller would ridicule Prado's speech by "making fun of her accent," which included "trilling her R's" and that Keller did so in meetings attended by other co-workers, when Keller, as supervisor, would assign cases. Doc. #68-1, PAGEID#930; Doc.#66, PAGEID#642. Prado also claims that Keller would make fun of Prado's clothes and jewelry at meetings referring to them as "shiny." *Id*. Doc. #66, PAGEID#604. According to Prado, Keller also encouraged co-workers to join in the harassment that she directed at Prado. Doc. #68-1, PAGEID#930. Keller's harassment also included her standing on a chair in a co-worker's cubicle and looking at Prado, laughing, joking and imitating her accent, as well as pounding on her cubicle. Prado claims [T]his happened many times." Doc. #68-1, PAGEID#932. Keller also allegedly encouraged a co-worker of Prado to move her chair over by Prado at meetings and to deliberately pass gas at her while others laughed. According to Prado, "[T]his was continuous throughout my employment and also occurred at other locations." *Id*. at PAGEID#934; Doc. #66, PAGEID#645.

Co-workers also allegedly harassed Prado, by "constantly imitating" her accent and some would walk behind her and imitate her walk. *Id*. at PAGEID#932. One co-worker would climb on a chair and imitate Prado and make grunting and pig noises when Prado was on the phone with clients. Doc.#68-1, PAGEID#932. Prado does not state when or how often this happened. Two different co-workers would "stop and look at me under my cubicle," which according to Prado happened "many times." *Id*. Co-workers would hit her cubicle or shake it. Doc. #66, PAGEID##37, 71 and 72. Prado does not state how often this occurred. Co-

38

workers also gathered outside Prado's cubicle near Christmas in 2014, and pushed each other into her office area. *Id.* at PAGEID#933. Prado also alleges that as part of her orientation process she was required to shadow other case workers. According to Prado, co-workers would say that they would meet her to take her shadowing, but then leave without her. Prado also claims that she was intentionally sent to the wrong address of a client on a snowy day, and that her car went into a ditch. Prado said she wore earplugs to work so she could do her job. Doc. #66, PAGEID#649

Prado has testified in her deposition that she tearfully complained to her then-supervisor, Jamison, concerning the harassment, including that from Keller, as well as Prado's concern that her co-workers might attack her. Doc. #66, PAGEID##649 and 663-664. This complaint was made, according to Prado, at the beginning of December 2014. *Id.* PAGEID#663. Prado also testified in her deposition that her cubicle was moved in front of Jamison's office because of the harassment. *Id.*, PAGEID#620. She alleges that Jamison reported Prado's harassment to Josh Coomer, the Family and Children Services Program Manager/Adoption Supervisor, at the end of November and early December 2014. *Id.*, PAGEID#634. The "papers" were passed out by Josh Coomer that allegedly concerned the policy of treating everyone with respect "and about how to deal with your co-workers." *Id.*, PAGEID#630; Doc. 68-1, PAGEID#933. Confidential counseling was offered by Josh Coomer to Prado, which she found to be insulting. Doc. #66, PAGEID#630. Prado claims that following this report of

harassment and the response of Josh Coomer, "[T]he harassment actually got worse" and that "Keller and others increased their ridicule and imitations and would pound on my cubicle." *Id.* PAGEID#932. Prado did not go to Human Resources to complain. Nor did she voice any complaint at any unit meetings, although she agreed that she could complain about anything at these meetings. *Id.*, PAGEID#700. Additionally, Prado did not file a grievance. *Id.*, PAGEID#710; nor did she review the personnel policy manual concerning harassment that she had received. *Id.* PAGEID#649.

Defendants, through the unsigned May 27, 2015, statement of Jamison, acknowledge that "assessment caseworkers did not demonstrate the same willingness to take her [Prado] out in the field as they were with the other new hires." Doc. #67-2, PAGEID#898. Additionally, Jamison's statement acknowledges that Prado went to her, presumably the week of November 17, 2014, "due to concern for the way she was being treated by those she sat near," that Prado's cubicle was moved to sit in the orientation cubicles and that Prado continued working assessment cases with Jamison. *Id.* at PAGEID#899. Jamison also states that she "worked closely with Glenda on cases" while she was in her unit, and that "we spent a lot of time on training her writing skills for activity logs and assessments." *Id.* Jamison continued to work with Prado, after her move to the Ongoing unit with a new supervisor, Pat Mazeika, during the week of January 19, 2015. Specifically, Jamison worked with Prado on SACWIS entry which was "part

of her goals from her evaluation" and they "would meet weekly to review tools to aid in SACWIS entry of required documents." *Id.*

According to the Rubin Affidavit, "[W]hen the Department became aware of Plaintiff s interactions with other employees, Chad King, a Children's Services Manager, addressed these issues with the Children's Services Division's supervisors, and reminded them that it is important to treat everyone with respect." Doc. #67-1, PAGEID#818.[9] The Rubin Affidavit states that following the "action taken by Mr. King on behalf of the department, Plaintiff did not speak to any member of management about the treatment she alleges to have been experiencing, and management believed that the situation had been resolved." *Id.*

Prado claims that the evidence before this Court establishes a *prima facie* case against Defendants for a hostile work environment based on her ethnicity. Title VII, however, does not impose a "general civility code," *Oncale v. Sundowner Offshore Services, Incorporated,* 523 U.S. 75, 81 (1998) (same-sex sexual harassment actionable under Title VII), and it does not include "the ordinary tribulations of the workplace," for example, "sporadic use of abusive language" or generally boorish conduct. B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992). See also 1 B. Lindemann & P.

---

[9] Exhibit F to the Rubin Affidavit indicates that a meeting was held of the Senior Team on January 15, 2015, and that they "[D]iscussed previous concerns reported by Heather [Jamison] regarding Glenda. Chad [King] stated that he addressed all concerns with the supervisors. [He][R]eminded [all] that it is important to treat everyone with respect." Doc. #67-2, PAGEID## 851 and 852.

Grossman, Employment Discrimination Law 1335–1343 (4th ed. 2007). *Vance*, 570 U.S. at 452 (2013) (Ginsburg, J., dissenting).

In *Opengeym v. Heartland Employment Services, LLC*, No. 16-1614, 2017 WL 5495714 (6th Cir. January 30, 2017), a plaintiff alleged, among other things, that she was denied "equal educational opportunities" because of her "ethnicity as a refugee from the former Soviet Union" and that she was subjected to a racially hostile work environment. *Id.* at *1. The hostile work environment occurred when a fellow employee told an offensive joke related to her ethnic group. The Sixth Circuit held that the plaintiff had not established a claim for a hostile work environment.

> To establish a *prima facie* case against an employer for creating a hostile work environment based on ethnicity or religion, a plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to unwelcome racial, ethnic, national origin, or religious harassment; (3) the harassment was based on race, ethnicity, national origin, or religion; (4) the harassment unreasonably interfered with work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (race); *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) (race and religion); *Boutros v. Canton Reg'l Transit Auth.*, 997 F.2d 198, 203 (6th Cir. 1993) (national origin and ethnicity). *Id.* at *2.

Moreover, the harassment necessary to create a hostile work environment must be of such severity or pervasiveness as to pollute the working environment, thereby "alter[ing] the conditions of the victim's employment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, (1993) (a "hostile" or "abusive" environment can be determined only by objectively looking at all the circumstances, which may

include the frequency, severity and whether conduct is physically threatening or humiliating; injury is not required).

In assessing whether Prado was subjected to a hostile work environment due to her national origin, Defendants do not appear to dispute anything other than whether the harassment unreasonably interfered with her work performance, by creating an intimidating, hostile, or offensive work environment and whether, as a result, Defendants are liable. Doc. #67, PAGEID##807-812. Although Defendants contend that "the record does not contain evidence of the frequency and pervasiveness" of the allegedly harassing conduct, and while the record is unclear in some respects as to when and how often certain events occurred in the six-month time period of Prado's employment, her Affidavit does state that Keller made fun of her accent by the trilling of the R's, a significant aspect of persons speaking the Spanish language, almost daily. Additionally, Prado was employed for only a six month probationary period and during this brief time provides enough information of other harassing conduct, e.g. Keller standing on the chair in a co-worker's cubicle and looking at Prado, and imitating her accent "[happened] many times," the deliberate passing of gas at Prado "was continuous throughout my employment," co-workers imitating her accent occurred "constantly" and co-workers looking under her cubicle happened "many times." In examining the alleged discriminatory conduct, the Court must consider various factors, including "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U. S. at 23. Irregular and sporadic acts, as opposed to those continuous and frequent, are unlikely to result in sufficient evidence of a hostile work environment. *Id.* Whether Prado's harassment is objectively so severe or pervasive as to constitute a hostile work environment is "quintessentially a question of fact," *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310 (6th Cir. 2016) (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006), and requires a "look at all the circumstances." *Harris*, 510 U.S.23. In *Waldo v. Consumers Energy Co.* 726 F.3d 802, 814 (6th Cir. 2013), the Sixth Circuit held that the district court did not abuse its discretion in granting a new trial for a hostile work environment claim following a jury decision for the employer. In affirming a subsequent jury verdict on the hostile work environment claim, the Court discussed the employer's liability for the harassing conduct of the employee's co-workers as well as the "totality of circumstances test."

> Under this totality of circumstances, 'the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case.' *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir.1999); see also *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82, (1998) ('The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.')

*Id.* at 814.

Based on the evidence before the Court, and in particular the totality of incidents raised by Prado that occurred in the six-month period of her probationary employment, a rational trier of fact could conclude that Prado was subjected to a hostile work environment. At a minimum, the allegations made by Prado raise a question of fact for the jury. *Williams v. General Motors, Corp.*, 187 F.3d 553 (6th Cir.1999) (district court reversed in hostile environment sexual harassment claim since it applied the wrong standard and failed to consider the totality of the circumstances).

With respect to the fifth prong of the *prima facie* case, employer liability, the harassment creating the hostile work environment was allegedly committed by both a supervisor, Keller, and co-workers. Although employers are vicariously liable under Title VII for actions of their supervisors, there is no evidence in the record that Keller, who was not Prado's supervisor, direct or otherwise, was empowered by Defendants to take "tangible employment actions against" Prado, such as terminating, reassigning, or promoting her. *Vance v. Ball State*, 570 U.S. 421 (2013) (co-worker who harassed employee and created hostile work environment was not a supervisor and employer was not vicariously liable since co-worker not empowered to take tangible employment action). Because of this, Keller is to be treated as a co-worker and the liability of Defendants, if any, is not vicarious, but, rather, based on principles of negligence.

In *Equal Employment Opportunity Commission v AutoZone, Inc.*, 692 Fed. Appx. 280 (6th Cir. 2017), the Sixth Circuit, citing to *Vance*, affirmed a summary

judgment in favor of the employer, Auto Zone, finding that a store manager of

Auto Zone, accused of sexual harassment and fired by his employer, was not a

supervisor. Acknowledging that *Vance* established a "sharp line between co-

workers and supervisors," the Court found that although the store manager

"supervised several employees, he did not hire and could not fire, promote,

reassign to a significantly different position, or cause a significant change in their

benefits." *Id.* at 281. The Court noted that "[i]f the harassing employee is the

victim's co-worker, the employer is liable only if it was negligent in controlling

working conditions"—that is, if the employer knew or should have known of the

harassment yet failed to take prompt and appropriate corrective action. *Id.* at 283-

84, citing *Vance,* 570 U.S. at 424. The Court then found that even if the store

manager was a supervisor, *AutoZone* had established an affirmative defense to

liability, since it investigated quickly, fired the harassing employee and plaintiffs

unreasonably failed to utilize the corrective opportunities.

> The defense has two elements: (1) 'that the employer exercised
> reasonable care to prevent and correct promptly any sexually
> harassing behavior'; and (2) that the harassed employees
> 'unreasonably failed to take advantage of any preventive or
> corrective opportunities provided by the employer or to avoid harm
> otherwise.' *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 1998);
> see also *Burlington Industries v. Ellerth*, 524 U.S. 742, 764-65 (1998).

*Id.* at 284.

Because there is no evidence in the record that Keller could hire, fire,

promote, reassign or cause a change in Prado's benefits, *AutoZone, Inc.* 692 Fed.

Appx., 283-84, the standard to be applied is whether Defendants were negligent in

"discovering or remedying harassment by [her] coworkers." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir.2010) as cited in *Waldo*, 726 F.3d at 829, n.2. Applying this negligence standard, the Sixth Circuit has held that a plaintiff must show that the employer's response effectively "tolerated or condoned the situation or that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action." *Jackson v. Quanex Corp.*, 191 F.3d 647, 659 (6th Cir.1999) (error for district court in hostile work environment claim to accept employer's defense that continuing racial slurs and graffiti were conventional conditions on the factory floor), quoting *Davis v. Monsanto*, 858 F.2d 345, 349 (6th Cir. 1988) (summary judgment for employer affirmed on appeal since evidence demonstrated that employer painted over racial graffiti the day after it was reported and posted notice that employees' behavior, in spitting on black employee's time card, would not be tolerated). Generally, a response to the harassment is adequate if it is reasonably calculated to end the harassment." *Jackson*, 191 F.3d at 663.

> Steps that would 'establish a base level of reasonably appropriate corrective action' may include promptly initiating an investigation to determine the factual basis for the complaint, 'speaking with the specific individuals identified by [the complainant], following up with [the complainant] regarding whether the harassment was continuing, and reporting the harassment to others in management.' *West v. Tyson Foods, Inc.*, 374 Fed.Appx. 624, 633 (6th Cir.2010); see also *Collette v. Stein–Mart, Inc.*, 126 Fed.Appx. 678, 686 (6th Cir.2005).

*Waldo,* 726 F.3d at 814.

The Court is unable to say, as a matter of law, that Defendants' response to Prado's complaint was "reasonably calculated to end the harassment." *Jackson,* 191 F.3d at 663. Although Prado's failure to make further formal complaints, read the personnel manual, or file a grievance, is relevant to any determination of the Defendants' liability, *AutoZone*, 692 Fed. Appx. at 286-87 (harassed employees have a duty to take actions to alert employer of sexual harassment), there is also insufficient evidence before this Court that Defendants "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," *AutoZone*, 692 Fed. Appx. at 284 or, more specifically, that Defendants conducted a thorough investigation or adequate response to the complaint. *Id.* at 285.

Prado complained to Jamison of harassment the week of November 17, 2014, and the response apparently consisted of Josh Coomer handing out "papers," presumably to the office, that reminded employees to treat everyone with respect. There is no further evidence as to what was on the "paper." Unlike the employer in *AutoZone,* there is no evidence, either in the Rubin Affidavit or the Mazeika Affidavit, that any investigation, formal or otherwise, was undertaken by Defendants following the first complaint by Prado and although the Rubin Affidavit attaches notes from a January 15, 2015, supervisors' meeting, this meeting occurred approximately six weeks after Prado's first complaint to her then supervisor, Heather Jamison. These notes from this January 15, 2015, meeting do not indicate that any investigation was conducted. There is no indication that Defendants spoke with the specific individuals that Prado allegedly

48

identified to Jamison or that Defendants followed up with Prado as to whether the harassment was continuing.[10] *Waldo* 726 F.3d at 814.

For the reasons stated above, Defendants' motion for summary judgment on Plaintiff's claim of hostile work environment through harassment is overruled, the Court finding genuine issues of material fact on the frequency, severity and pervasiveness of the harassment, and whether Defendants' knew or should have known of the extent and nature of the harassment, yet failed to take prompt and appropriate corrective action, i.e., the adequacy of Defendants' response, as well as Prado's failure to make further formal complaints, read the personnel manual, or file a grievance.

### 3. Plaintiff's Third Cause of Action - Retaliation

In Prado's Third Cause of Action, she alleges the following:

135. Plaintiff's arrest and discriminatory and humiliating treatment subsequent to her arrest at the Greene County, Ohio Jail and the public posting of her name and picture as an inmate of the Jail was in retaliation for her refusal to acquiesce in the circumstances of her termination and/or, her subsequent EEOC complaint[.]

136. This arrest was used by Defendants Rubin, Huddleston, Greene County, Ohio Department of Job & Family Services, Greene County, Ohio, Board of Commissioners and Greene County, Ohio to intimidate the Plaintiff and gain advantage in the EEOC action[.]

---

[10] Based on Prado's Affidavit, there is evidence that shortly before Prado was terminated on March 10, 2015, Jamison asked Prado, allegedly at the suggestion of another supervisor, as to whether she was still experiencing harassment. Prado advised that she was. Prado states that this conversation occurred in "mid-to late February, 2015," Doc. #68-1, PAGEID#935

Doc. #34, PAGEID#216.

There is no dispute that Prado was terminated from her probationary

employment on March 10, 2015, filed an EEOC charge on May 19, 2015, and was

arrested on August 9, 2015, for a traffic violation.[11] Doc. #67-2, PAGEID#863. While

retaliation is a recognized category of wrongful employer conduct prohibited by

Title VII, as will be seen below, Prado has failed to show a genuine issue of

material fact on such claim.

The unlawful employment practice of retaliation reads, in part, as

follows:

> (a) Discrimination for making charges, testifying, assisting, or
> participating in enforcement proceedings
>
> It shall be an unlawful employment practice for an employer to
> discriminate against any of his employees… because he has opposed
> any practice made an unlawful employment practice by this
> subchapter, or because he has made a charge, testified, assisted, or
> participated in any manner in an investigation, proceeding, or
> hearing under this subchapter.

42 U.S.C.A. § 2000e-3

Prado cannot establish any unlawful employment practice based upon the

uncontested facts of this case or even based on the facts construed most strongly

in her favor, because there is no evidence that Defendants retaliated against her.

At the time she engaged in protected activity and filed her EEOC charge, she had

---

[11] Prado has filed a separate complaint against the Greene County Deputy Sheriff, Jeffrey
Thomas, various members of the sheriff's department, and the county administrator,
*Glenda Jacqueline Prado v. Deputy Sheriff Jeffrey Thomas, et al*, Case no. 3:16-cv-00306,
as a result of the allegedly wrongful arrest and detention on August 9, 2015.

been terminated from her probationary job for approximately two months. Five months after termination, and approximately three months after filing her EEOC charge, she was arrested by individuals, albeit employed by Greene County, who were otherwise unaffiliated with the Children's Services Division of the Greene County, Ohio, Department of Job and Family Services. Even with the most expansive and liberal reading of 42 U.S.C.A. § 2000e-3, Prado cannot establish that Defendants engaged in any retaliation against her for filing the EEOC charge.

Although Prado raises in her Response, for the first time, new theories that supposedly support a claim of retaliation, these are nothing more than allegations unpled in the Amended Complaint of which Defendants had no notice until after discovery had closed and their summary judgment motion was filed. Prado's retaliation claim, as cited above in her Amended Complaint, was specific and only included the events involving "Plaintiff's arrest and discriminatory and humiliating treatment subsequent to her arrest at the Greene County, Ohio Jail and the public posting of her name and picture as an inmate of the Jail..." Doc.# 34, PAGEID#216.  Moreover, Prado's EEOC charge from May 2015 does not include any of these newly disclosed, allegedly retaliatory incidents. Doc. #67-2, PAGEID#863. Because Defendants had no notice of anything other than what was alleged in the EEOC charge and in the Amended Complaint, the Court will not consider Prado's new theories in support of her retaliation claim.

Finally, Prado has not established, for the reasons previously stated, that "her protected activity was a but-for cause of the alleged adverse action by the

employer" or that the events surrounding her arrest on August 9, 2015, five months after her termination and three months after filing her EEOC complaint, were in retaliation for her having filed such a claim. *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013) (physician who had alleged constructive discharge due to his race and religion must prove retaliation claims according to traditional principles of but-for causation).

Defendants' motion for summary judgment on Prado's third cause of action for retaliation is sustained.


## III. Conclusion

For the reasons set forth above, Defendant's Motion to Strike certain paragraphs of Prado's Affidavit, Doc. #70, which the Court has construed as objections to Plaintiff's evidence in her response to Defendants' motion for summary judgment under Fed. R. Civ. P. 56(c)(2), is OVERRULED in part and SUSTAINED in part as follows:

1. Defendants' objections are OVERRULED due to hearsay and/or lack of personal knowledge for paragraphs 2, 4, 7, 13, 14, 32, 44, 47, 51, 55 and 56 of Prado's Affidavit, Doc. #68-1. The Court is not required to strike these paragraphs.

2. Defendants' objections are SUSTAINED due to hearsay and/or lack of personal knowledge for paragraphs 11, 22, 27, 28, 31 and 33 of Prado's Affidavit, Doc. #68-1. The Court may not consider these paragraphs.

3. Defendants' objections are OVERRULED in part and SUSTAINED in part due to hearsay and/or lack of personal knowledge for portions of paragraphs 23, 36, 41, 42 and 45 of Prado's Affidavit, Doc. #68-1. The Court will consider only those portions of these paragraphs that have been overruled.

4. Defendants' objections are OVERRULED on the grounds that paragraphs 2, 7 and 33 of Prado's Affidavit, Doc. #68-1, directly contradict Prado's deposition testimony, Doc. #66. The Court is not required to strike Paragraph 2 and 7 from Prado's Affidavit, Doc. #68-1. As to Paragraph 33, the Court has previously determined that it may not consider this paragraph due to hearsay and/or lack of personal knowledge.

Defendants' Motion for Summary Judgment, Doc. #57, is SUSTAINED as to claims one and three, for disparate treatment and retaliation, respectively, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, and Ohio Rev. Code § 4112, et seq. The Motion for Summary Judgment is OVERRULED as to Prado's claim of hostile work environment through harassment pursuant to Title VII of the Civil Rights Act of 1964 and her claim of discrimination (hostile work environment) in violation of Ohio Rev. Code § 4112, et seq., as alleged in her Second Cause of Action.

Date: March 21, 2019

WALTER H. RICE
UNITED STATES DISTRICT JUDGE